The first case set for oral argument this morning, February 19th, 2020, is case number 19-6013, N. Ray Gasmart, USA, Inc., Richard S. Lauter, etc. v. Wells Fargo Bank, N.A. Good morning, counsel. Mr. Eggert, are you ready to proceed on behalf of the appellant? Yes, Your Honor, I am. Go ahead. Good morning, Your Honors. May it please the Court, my name is Devin Eggert, appearing on behalf of Richard Lauter as trustee for the Gasmart, USA, Accreditor Trust. There are several issues up on appeal before Your Honors today with respect to Wells Fargo's contemporaneous exchange for new value defense through the trustee's preference claim. If I may, I'd like to start with the question of whether there was any value in Wells Fargo's lease that was released as part of the prepetition sale to Travel Center. So what I'd like to start with is how the bankruptcy court basically set out its analysis of what should happen. And by the way, I think the court did set forth what the analysis should be. And what that analysis should be is two steps to determine if there was any value in this lien. The first is determine the value of the underlying collateral. The second question then is to look at other liens to determine if after payment of those liens, there's anything left in terms of equity for Wells Fargo's liens. Now, the court first went through the value of the collateral, found that the furniture, fixtures, and equipment, typically called the FF&E in the opinion, was worth roughly $1.4 million. No one or the trustee is not challenging that as part of this appeal. I want to make that clear just because Wells Fargo spent some time on that. That's not something the trustee is challenging. Where it gets interesting from the trustee's perspective is looking at the other liens to determine if there was value in Wells Fargo's lien, if there was any equity in that lien. So two things the bankruptcy court notes with respect to the other secured parties. One, Sun Life was a senior secured creditor. So it was higher in priority to that of Wells Fargo. Two, Sun Life was not despite the fact that it was the senior secured creditor, it did not get paid in full, whereas Wells Fargo, a junior secured creditor, did receive some money. So despite this fact and notwithstanding this, the bankruptcy court said there was value in Wells Fargo's liens because Sun Life must have agreed to take less than the full payment. Now, I think that's problematic for a couple reasons. There's nothing in the record that says... Well, you say must have agreed. It's a fact. They did agree to take less. They did agree to take less. But there's not a... I guess what I mean by that is there's not an acknowledgement by Sun Life that they should take less. It's that they needed to take less in order for the sale to go through. But if your client then recovers, doesn't that money then have to go back to Sun Trust if your argument is they weren't paid in full? Doesn't their claim still exist in the bankruptcy? Their claim does still exist in the bankruptcy. So the money wouldn't go to the estate for the benefit of unsecured creditors. I mean, that's contrary to the argument that you're making. I'm sorry. This is an avoidance action and Sun Life did not have a lien on avoidance actions. At this point in the case, Sun Life, the rest of its collateral has been sold. So at this point it has an unsecured claim. But the lie... It would have taken it at that time if this would have gone through at that time. But how can you argue that both ways? Either they have a lien that they weren't able to reduce or they don't have a lien. And I think that, you know, whether this is an avoidance action or not, those proceeds arose from the sale of collateral that was arguably theirs under your position. I think it was their collateral. That's correct, Your Honor. But the situation and the problem that Sun Life was faced with was that this sale would not go through if Wells Fargo did not receive money. And the reason is because Wells Fargo refused to release its lien as part of the sale unless it received money, notwithstanding the fact that its lien had no value. So is there anything wrong with that? I mean, you say that as if Wells Fargo did something horrendously wrong. And aren't they allowed to say, I'm not going to release my lien? Wells Fargo is allowed to say that, but when it rolls into a bankruptcy, they have an issue of Well, it wasn't in bankruptcy, though. It was not at that time. This did happen within 90 days prior to the bankruptcy. So the issue they have is that they received money, in essence, as an unsecured creditor because their lien had no value. So that's why it becomes a problem. I'm not saying that what Wells Fargo did at that time is wrong or something I'm still struggling with the lien had no value. The moment that Sun Life agreed to release its lien on the FF&E, didn't the lien of Wells Fargo, by default, have value? Because nobody else had a lien on it, right? Well, there's the issue of whether the IRS had a lien, but I don't think that's true. Yeah, I don't think so. Did the IRS file an amended proof of claim that said we're not secured? At the very end of the bankruptcy case, it did. So the bankruptcy case occurred more than two months after the sale took place. At the time of the sale, the IRS had a UCC on file for a secured claim of $1.5 million. The proceeds it received from the sale was only $600,000 from the sale of inventory. And the lien release that was set forth in the sale, which is what we should be looking at for purposes of the Contemporary Exchange for New Value defense, at that time, the IRS still had a lien. Now, what happened in the bankruptcy afterwards is what the bankruptcy court relied on to find that there wasn't a lien at that time. So the IRS didn't get paid out of the proceeds from the sale? It received $600,000 from the sale. It did not receive $1.5 million, even though that was the amount of its lien. So I think I want to step back to talk a little bit about what this would mean if this were the law, and if a secured creditor whose lien had no value, if there were secured creditors above it that were not paid in full, and yet a junior lien holder could make this happen. So basically what that would do is encourage junior lien holders to be very aggressive and push to get paid, even though their lien has no value. So it would almost take the priority system of secured creditors and turn it on its head, because there would really be no repercussion for a junior lien holder in this sort of situation. So when you have this sort of situation, you have a per se rule? I think that the per se rule should be, if a senior secured creditor is not paid in full through the sale of its collateral, the junior liens would therefore have no value. Because if you have a senior lien holder that isn't paid in full, how can that junior from the sale of that collateral, how can that junior lien be said to have any value? Well, that's kind of basic law, but you have to introduce the concept of waiver, don't you? Waiver of? Sons. Lien. Sons' lien. Well, but the reason that happened is because it had to have this. I think your analysis kind of ignores that, doesn't it? I don't know if it ignores it. I think it assumes the reality of the situation, which is that. But the reality was that they waived a portion of their claim. They did not waive a portion of their claim. They still retained their claim, but they did not receive full payment for a lease of their liability. But isn't that their prerogative? It's interesting you phrase it that way, Your Honor, because it had to be their prerogative if the sale was going to take place. In other words, the only reason they agreed to do this, and the correspondence, the back and forth makes this clear, is because Wells Fargo realized it had the leverage to require a payment in order to release its lien. So if you have a pre-petition sale and the senior creditor is not going to be paid in full, under the bankruptcy court's opinion, the junior lien holder has the ability to extract value out of its lien, notwithstanding the fact it doesn't have any money or any equity. But didn't Wells Fargo also have some skin in this game and had to release some claims because of the conversion of inventory through the sale that occurred? That's correct. So turning to that, Your Honor, that deals with the whole, what's called the KCRC inventory Phillips 66 transaction. So what happened in connection with that is Phillips 66 wanted a release from Wells Fargo because Wells Fargo had been asserting that inventory that had been turned over in a prior transaction was subject to Wells Fargo's lien. So what happened in that transaction was, as part of the sale transaction, Wells Fargo gave a release to Phillips 66 such that it would not pursue Wells Fargo for the recovery of that inventory. So that was a release between Wells Fargo and Phillips 66. Now, where the bankruptcy court said that provided new value to the debtor, to GasMart, is because, as part of that, Phillips said it would give GasMart more time to pay for fuel purchases that had already been incurred. And just for the Court's note, I had reserved five minutes on rebuttal. I'm almost at that point. The last issue I would make, though, with respect to the Phillips 66 is what the court found to be new value was that additional time to pay. And it said that why it was new value is because that restructuring of the payment schedule termed it out for more than two years. The problem is that did not occur, this term out for two more years. The promissory note was not put into place until two months later. So at the time of this transaction, there was not this two-year term. And the bankruptcy court said that this promissory note came into existence two months later, but the deal was in place at the time of the sale, the time Wells Fargo received its money. I don't think the evidence supports that. The only evidence with respect to when that agreement came into place or what was in place at the time of the TA sale was Mr. Tittle, the CEO of GasMart's testimony, that that agreement for a two-year restructuring was not in place at that time. The only agreement at that time was for an additional 90 days to pay, and that was an oral agreement. And with that, I will reserve the rest of my time for rebuttal. Thank you. Mr. Sutton. Thank you, Your Honor. I'm Steve Sutton. I represent Wells Fargo Bank. I'm going to take up where the discussion just left off with regard to testimony on the Phillips 66 release issue, because there is explicit testimony in the record from the former CFO of GasMart, Marcus Morgan, who said that on the sale date, the Phillips 66 release resulted in new credit extended on that date by Phillips 66, and that the July 1 promissory note is in fact a documentation of what was agreed to on April 30th. He simply didn't sign it up until July 1st. That comes from the CFO of the company at the time, in addition to the same kind of testimony from Mr. Tittle. So Judge Dow had plenty of evidence in front of him to conclude that the Phillips 66 release and the new credit that was extended on that was extended and allowed new gasoline to be supplied by Phillips 66 that allowed the debtor to stay in business and provided new value to the estate. And you think that took one day? What was the difference one day between the date of transfer and the date of the agreement? The new credit extent that was created, I think Mr. Morgan's testimony went into effect within a few days. So was this two-year note then that Mr. Eggers refers to, or the two-year restructure, did that come after? The two-year, well no, the new credit arrangement was confirmed by Mr. Morgan to have existed within a few days of the sale because of Wells Fargo's release of its claim against Phillips 66. That's what Phillips 66 consisted on if it was going to provide the new credit terms to the debtor. And as far as the terms of it, that's what Mr. Morgan testified to is that the documentation of those terms is in the promissory note. It's dated July 1, but he said it was agreed to and went into place within a few days after the sale. With regard to the question about, from the beginning, one thing that hasn't come out or wasn't stated is that the contract between the buyer and the seller here required that all the leads, this wasn't some kind of foreplay or harsh dealing by Wells Fargo. If the sale was going to occur for the benefit of everybody, all the liens had to be released. That's what the buyer required. As you would think, they were paying $27.6 million for all of the assets and they didn't want to take it subject to the liens of GasMart. And so these liens, everybody had a right, a perfectly legitimate right to ask to be why Sun Life did what it did, but I think it did what it did because it knew that there had to be money left for the other secured creditors, UMB and Equity Bank and Enterprise Bank and Great Southern Bank, as well as Wells Fargo, to get something so that they would agree to release their liens. And that's a very common negotiation. There is email after email between the various creditors trying to get to the closing that went up right to the closing date. And so, but all of this is because, as you'd expect, the buyer insisted that it receive its property free and clear of any existing liens that had occurred because on behalf of the debtor. I think the There are two ways to do that, right? Or one way to do that, and that's either, or two ways. By negotiation, which is what happened, or by filing bankruptcy and selling it free and clear of liens and valuing the Right. Each But the trustee's argument that he's proposing is basically a restatement of 547B5. He's applying the bankruptcy liquidation test and say that's the way to look at it, and if you wouldn't have been paid if it had their bid of bankruptcy, and then B5 says in a Chapter 7 case, and assuming the transfer hadn't been made, well, he's doing it all over again. He's taking B5, and we've already conceded B5 as part of the trustee's case, and now he wants to do it again. And if you do that, it basically guts 547C1. What is your response to the issue of the Internal Revenue Service having a secured claim? Well, they had a secured claim at one time. We know that there was a tax lien filed 15 days before the sale occurred on February 3, 2014. We know that they received $603,000 to $788 and discharged the lien to that extent in connection with the sale. In fact, the letter to that is dated April 27th, which is three days before the sale, so the debtor had been in contact with the IRS about that. That's all they asked for. That's all they got, and they never said anything else. There was nothing in the record to say there was any remaining lien. So the tax lien was discharged, and then we know that they filed a proof of claim as of July 2, 2015 that they amended several times, but they got to realize that they had no tax lien at all 60 days later. And then, in addition, there's nothing in the record to reflect that anything happened between April 30th and July 2 in the form of either a demand by the IRS, the trustee would have all these records if there had been one. So your position is the service had a lien, it was paid, it's satisfaction, nothing special about that transaction? Right. Basically the same as Sun Life, right? Pardon me? Same issue as with Sun Life. They had a lien, they were paid to their satisfaction. They resolved it for what they received, and just like Sun Life, they took, you know, Sun Life took at least $10 million less than they could have, and the difference between what it took, $14.7 million, and $27.6 million is almost another $13 million. So what do you say to the argument that you've conceded the prima facie elements of a preference, and by doing so, you're acknowledging that Wells Fargo would not have received payment had the debtor been liquidated on that date, 90 days prior to filing. But didn't, wouldn't Wells Fargo, I'm wondering why Wells Fargo conceded that point, as opposed to saying, well, these other folks agreed to release their lien, so we would have received that same payment, whether it was... Well, that's the point, is that the elements of B-5 don't allow for that. In my view, it says there's a bankruptcy, payment hadn't been made, and doesn't go further and allow for the circumstances that we raised in C-1 to be moved over to B-5. Well, if you've got the agreements to release, though, isn't it the same issue? I mean, if there's a release payment made to the prior secured creditors, there's still equity available for Wells Fargo. So I was curious how, why Wells Fargo conceded that point. Because I don't think we could have brought over, say, and plus everything that B-5 requires, there's an agreement that, because in a bankruptcy, Sun Life might not have taken that. Maybe they wouldn't have. I don't know. So is your argument the timing of when the bankruptcy was, either at the time of sale or later? I mean, I guess I'm not understanding. There's no doubt that for C-1 standards, the timing is the date of the transaction. It's not the bankruptcy petition date. It's the date of the transaction. The date of the transfer. Of the transfer, right, in question. I think Judge Schirmer's opinion in the Falcon case establishes that. So I think that's what we have to deal with is what happened on the day of the transfer. And what happened is Sun Life released this lien. Equity Bank was paid. Well, they were the only two lien holders that were senior to Wells Fargo. And that moved Wells Fargo up in the line of priority. And we were in, we proved we had value was a million. The trustee don't longer contest that. And we released our lien on that day. Along with all the other creditors who released their liens. So that does establish that there's a million for in new value for the benefit of the state. And then, as well, there was equity beyond what payments were to the secured creditors. You look at page four of my brief, I have a waterfall chart drawn from the closing statement that shows secured creditors, other than Wells Fargo, were paid $23.9 million. Whether it was for mortgages or, mostly it was all for mortgages. So that left $3 million to pay Wells Fargo, which it took $1.3 million at that point. And then there was $1.7 million left to pay other creditors. I mean, that's all equity. So there was equity there to pay other creditors and the estate was benefited. Because the sale wouldn't have occurred if all these creditors, including Wells Fargo, hadn't released their liens. So speaking of $1.3 million paid to Wells Fargo at closing, $100,000 was paid the day before. Right. So explain to us how that is tied into a contemporaneous exchange. Well, because it was all part of the same transaction. They were negotiating the day before with regard to what was going to happen at the closing. So did they really get $1.8 million then on their claim? Or was that $100,000 separate? $1.4. $1.4, I'm sorry. $1.4. Yeah, and that's what we got sued for, $1.4 million. The value that was generated by the lien release was property worth $1.4 million. And then on top of that, that generated $1.7 million in equity for the estate to pay other creditors related to these properties, pay other taxes that weren't liens, and, you know, mechanics lien claimants and closing claims. It's all to the benefit of the estate. I've just got a couple minutes left. On the Phillips 66 release, I would like to go back to that. Let me address that briefly. The other component of Judge Dow's opinion about that was what was the value of the new credit that Phillips 66 extended because Wells Fargo released its collateral conversion claim against them. And the value of that was established to be what the value was of the consignment payment that Phillips 66 was making to the debtor post-petition. They cut off the debtor's fuel supplies post-petition. They changed entirely the arrangement so it would be they would supply gasoline on consignment. They would receive all of the revenues from the sale of the gasoline. And in addition to that, they agreed to pay the debtor $276,000 per month for the right to receive all the gasoline proceeds. Well, that's the same thing that the debtor got as a result of Phillips 66 release. They got this new credit. They got new fuel supplies. All these fuel supplies came in. They sold the gasoline for the next two months. And the evidence from the Phillips 66 consignment agreement is the right to receive all of those revenues worth at least $276,000 a month because that's what Phillips 66 was willing to pay to receive it 60 days later. So that's another $552,000 for the two months between the closing date and the petition date that benefited the estate. And the testimony is that the debtor received all of those revenues and paid nothing to Phillips 66 for it. So the estate was better off substantially as a result of Wells Fargo releasing its collateral claim against Phillips 66 that generated this new credit and new fuel supplies for the next 60 days. And the sum of those two things is almost $1.9 million in new value based on the lien release and the Phillips 66 release. Mr. Sutton, your client did not appeal the $73,000? No, Judge. We conceded that at that point. A few seconds left. Does anybody have any other questions? No. Thank you. Thank you. Mr. Eggers? Eggert? Thank you. I want to start with one of the topics that Mr. Sutton touched on. This $100,000 payment that was made the day before the closing. There were two payments. There was $100,000 made on April 29th. Then there was the $1.3 million that was paid out of the sale closing. With respect to this $100,000, what the bankruptcy court found is all of the contemporaneous exchange for new value defenses applied because this was an advance payment on a deal already struck. And the bankruptcy court refers to several exhibits that were emails to the site to this. The problem is the evidence does not support that. What those emails show is that Wells Fargo's counsel said unequivocally, the payment of this $100,000 is necessary for us to continue talking. We're not even going to talk about a global deal with respect to the sale until you pay this $100,000. Now, in Wells Fargo's brief, they talk about the timing of two emails, and they refer to an email from Mr. Tittle, the CEO of Gaspart, where he says we have a deal in response to several terms, one of which being a $100,000 payment. The problem is Wells Fargo's counsel responds later that evening, approximately nine hours later, and says we don't have a deal. We have all these conditions, one of which being you pay us $100,000 as a precondition to us even continuing to talk. So I think the record is clear that the $100,000 was not an advance payment on a deal already struck. It was a separate payment that had to be made for Wells Fargo to continue even talking about, potentially, a deal with respect to the sale. But that talk, that additional time that was purchased, was only one day, wasn't it? It was only one day. Because they closed the next day. No, no, they did not close the next day. So they had this correspondence April 28th. $100,000 was paid on April 29th. They continued to talk and then they had the sale the next day. What is it, two days? It was two days. So the problem is there was no new value given with respect to this $100,000. All of these things that the bankruptcy court said were new value, the release of the liens, the Phillips 66 release, none of that was in place at this time. There wasn't a deal for that to happen. It was a $100,000 payment if the debtors, if GasMart, wanted Wells Fargo to continue talking about a potential deal. That's the distinction. So turning back to the Phillips 66 release and what Mr. Sutton refers to as new credit, he talks about the testimony of the CFO, Marcus Morgan. Marcus Morgan did talk about getting additional time to pay the Phillips 66 fuel supply invoices. But what he doesn't talk about is what that deal was at the time of the sale transaction. Never in Mr. Morgan's testimony does he state that at that point in time, Phillips 66 was going to give a two-year promissory note for GasMart to repay that. That testimony does not exist. The only testimony that exists with respect to what the deal was with Phillips 66 at the time of the sale is Mr. Tittle, the CEO's testimony, where he states that at that point, Phillips was only going to give them additional 90 days to pay. This two-year restructuring did not come into place at that point. That did not exist at the time of the sale. So I think that's a point that is important. I also wanted to touch on the value that was given to the Phillips 66 transaction because obviously there's two components to finding that being a contemporaneous exchange for new value, one of which being there was new value that was given to the debtor. The second component is how do you place a number on that? How do you quantify this new value? And what the Bankruptcy Court did is it took a consignment agreement that happened Thank you, Mr. Eggert. Your time has expired. Thank you.